IN THE UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS
PEORIA DIVISION

| | |
|---|---|
| JEAN MARIE THOENNES, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Case No. 17-1278 |
| | ) |
| COMMISSIONER OF SOCIAL SECURITY | ) |
| | ) |
| Defendant. | ) |

## ORDER & OPINION

This matter is now before the Court on Plaintiff Jean Marie Thoennes' ("Plaintiff") Motion for Summary Judgment (ECF No. 9) and Defendant Acting Commissioner of Social Security Nancy A. Berryhill's ("the Commissioner") Motion for Summary Affirmance (ECF No. 12). For the reasons stated herein, Plaintiff's Motion for Summary Judgment is DENIED and Defendant's Motion for Summary Affirmance is GRANTED. This matter is now terminated.

## JURISDICTION

Plaintiff seeks judicial review of a final decision of the Commissioner which found he was not entitled to Period of Disability and Disability Insurance Benefits based upon disability. This Court has jurisdiction over this action pursuant to 42 U.S.C § 405(g).

## PROCEDURAL AND FACTUAL BACKGROUND[1]

On March 21, 2014, Plaintiff filed her applications for Period of Disability and Disability Insurance Benefits, alleging a disabling condition with the onset date of January 12, 2013. Her initial claims for disability listed a heart condition, unstable blood pressure and stroke. (R. at 56). Plaintiff's claim was denied initially on September 5, 2014, and upon reconsideration on March 6,

---

[1] Facts included are cited from the Plaintiff's Motion for Summary Judgment unless otherwise indicated. (ECF No. 10).

2015. Plaintiff then requested a hearing before an Administrative Law Judge ("ALJ"). On April 28, 2015, ALJ John Wood held a hearing and on June 8, 2016, denied her benefits. Plaintiff appealed the decision and it was denied on April 11, 2017. Plaintiff then filed a complaint for judicial review under 42 U.S.C. §405(g). On November 20, 2017, Plaintiff filed a Motion for Summary Judgment (ECF No. 9) and Defendant filed her Motion for Summary Affirmance on January 17, 2018 (ECF No. 12).

Plaintiff was born January 28, 1956, and was fifty-seven years old at the alleged onset of her disability. Plaintiff is 5'2" and weighed 240 pounds at the time of her hearing and she has been labeled as obese by various doctors. (R. at 1712, 1870). At the time of filing, she was legally separated from her husband and lived with her daughter. She testified that she had completed some college. (R. at 39). Plaintiff smokes even though she has been told numerous times that it is bad for her health. Plaintiff was last employed was on January 2013, when she was laid off. (R. at 40). During her last job, she served as a receptionist and did billing for a recycling company. (R. at 40). Plaintiff did not engage in substantial work during the period beginning at her alleged onset date, January 12, 2013, to her last date of insurance, September 30, 2015.

The Plaintiff was seen almost monthly by Dr. Vales, primarily for her hypertension, but he also treated her depression, edema, dizziness and chest pains. (R at 261- 313). Plaintiff was hospitalized from January 2, 2014, until January 10, 2014, for a syncopal episode, vomiting and urinary tract infection. (R. at 698-717). While in the hospital in January of 2014, Plaintiff had a psychiatric consultation for her depression and anxiety. (R. at 693). The doctor arrived to find the Plaintiff appearing to be sedated and that her "speech [was] slurred and she [was] unable to stay on topic during the evaluation. (R. at 693). He diagnosed her with depressive disorder and possible over medication. (R. at 695). The Plaintiff was again admitted to Advocate Bromenn Medical Center from March 4, 2014, until March 7, 2014, for hypertension, anxiety, depression and

2

coronary artery disease. (R. at 730). One of the progress notes indicates that her low blood pressure is the cause for her symptoms. (R. at 718). The discharge papers noted that Plaintiff was told that she needs to lose weight and that it "is probably the key to all her issues. (R. at 730, 739). Plaintiff visited the emergency room on March 18, 2014, complaining of a severe headache and high blood pressure. (R. at 754). She was successfully treated for her headache, her blood pressure was stabilized and she was told to follow up with her primary care doctor and to stop smoking. (R. at 760). Plaintiff was admitted to the hospital in July of 2014, to treat angioedema, triggered by a reaction to medication and alcohol. (R. at 781).

On September 3, 2014, the Plaintiff saw Dr. Felicitas Sebastian for a psychological evaluation. (R. at 823). Dr. Sebastian concluded that

> her psychological condition appeared to be the result of stress from martial problems that affect her health (blood pressure) and unresolved trauma. She appeared to have fair mental potential to perform work related activities involving understanding and memory, sustained concentration and persistence, social interaction and adaptation.

(R. at 826).


**<u>Hearing Before the ALJ</u>**

Plaintiff's attorney's opening statement stated that Plaintiff suffers from a heart condition, chronic swelling of the legs, depression and anxiety that prevent her from being able to work. (R. at 37).

Plaintiff testified that she only drives "two or three times a month," because she does not feel safe or like she has control. (R. at 39). When asked about doing household activities, Plaintiff stated she "could do a little bit, but it's a little bit then I have to sit down and rest, or take a--- use my inhaler, or nebulizer." (R. at 41). Plaintiff also testified that she leaves her home to go grocery shopping, and to the library but only with the assistance of her daughter. (R. at 42). The Plaintiff also testified that before she was laid off in 2013, her boss "was very understanding if I had to

leave, or go to the emergency room, or be in the hospital" when she was dealing with blood pressure spikes and drops. (R. at 40). Plaintiff was asked why she would be unable to work a similar job again and she stated, "if I sit for a very long my legs swell very badly, and my feet, and my ankles and everything. And if I get up and walk, or get up, I get very dizzy. I sometimes fall down." Plaintiff also stated that her concentration and comprehension problems became an issue after her heart surgery and "it's very hard for me to read because I can't concentrate." (R. at 44).

Plaintiff's attorney asked her questions about her mental health. (R. at 45). It was introduced that Plaintiff sees a mental health care professional for counseling. (R. at 45). The Plaintiff described that "I get very low when my health is bad, and then I kind of close in on myself and sleep a lot." (R. at 45). She also stated that she sometimes has to take medication for panic attacks. (R. at 46).

Plaintiff's attorney also questioned her about her swelling. (R. at 46). She testified that it happens "all the time" and "sometimes it's just worst [sic] than others." (R. at 46). Plaintiff stated that her ankles, tops of feet, hands, face and eye lids swell. (R. at 46). Plaintiff explained that when her legs and feet are swollen she has to "keep my legs up at least waist high" or "lay on the floor and put them on the couch," and sometimes must keep her legs elevated most of the day. (R. at 46). Plaintiff testified when she attends her monthly social event, which lasts about an hour and a half, she puts her feet up on a chair. (R. at 47).

Plaintiff's attorney asked the Plaintiff about her chest pains and she testified that she takes nitroglycerin two to four times a month. (R. at 47). Plaintiff also stated that she suffers from bad headaches that will last hours as a side effect of the nitroglycerin. (R. at 47).

Once the Plaintiff's examination was complete, vocational expert, Dennis Gustafson testified. (R. at 48). The expert testified that a person limited to sedentary work with the restrictions given by the ALJ would be able to perform the jobs of a collection clerk, receptionist,

insurance clerk and purchasing clerk. (R. at 49). The ALJ asked him if these jobs would allow for positional changes through the day and he responded that movement is "pretty regularly available." (R. at 50). He continued to explain that "all jobs offer the opportunity to stand at the workstation, but other than the collection clerk, there would be quite a bit of opportunity to walk around an office environment" and to alternate between sitting and standing would be possible. (R. at 50). The expert also testified that all of these jobs involve more than occasional interaction with people, including the public and supervisors. (R. at 51). The ALJ inquired about what level of skill was required for these positions and the expert testified that they were all semi-skilled or skilled positions. (R. at 51). The expert opined that the typical employer would tolerate two absences a month. (R. at 51). The expert said the previously listed positions would require an employee to stay on task for "about 80 percent of actual time or 90 percent of the productivity expectation." (R. at 52).

Plaintiff's attorney asked the expert what tolerance an employer would have for someone to elevate their legs during the day. The expert opined "normally that's not going to be allowed in that type of environment. There's--- certainly that opportunity during break time." (R. at 52). The ALJ followed-up with questions about the opportunity to take breaks and the expert testified "although in these jobs it's somewhat more flexible when you take [a break], but the aggregate amount would be the same." (R. at 53).

Finally, the Plaintiff made a statement:

I would like to work but it's very difficult if you can't sit for very long, or stand for very long… I get confused easy, I have trouble remembering things. Sometimes I get lost in conversation because I'm like—I don't know why that happens, it's probably the medication. The fear of falling is great… if my blood pressure goes up I have to leave work because I have to either go to the emergency room or the doctor.. A year ago I was in the hospital and they put me in a nursing home for six weeks…I have home nurses now. And they started out once a week, and now they're twice a week.

(R. at 54-55).

5

**ALJ Decision**

The ALJ's concluded that "the claimant's allegation of complete and totally disability cannot be fully accepted." (R. at 27). In his Residual Functional Capacity ("RFC") finding, the ALJ stated "her past relevant work consisted of sedentary work that, as performed in the national economy, could be performed either sitting or standing and allowed for flexible break time…" (R. at 27).

The ALJ made the following findings:

1. The claimant last met the insured status requirements of the Social Security Act on September 30, 2015.
2. The claimant did not engage in substantial gainful activity during the period from her alleged onset date of January 12, 2013 through her date last insured of September 30, 2015 (20 CFR 404.1571 et seq.).
3. Through the date last insured, the claimant had the following severe impairments: COPD/asthma, obstructive sleep apnea, hypertensive vascular disease, coronary artery disease, and obesity (20 CFR 404.1520(c)).
4. Through the date last insured, the claimant did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).
5. After careful consideration of the entire record, the undersigned finds that, through that date last insured, the claimant had the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567)a) except: she could not climb ladders, ropes, or scaffolds; she could occasionally climb ramps/stairs, balance, stoop, kneel, crouch, and crawl; she needed to have the option to alternate between a sitting and standing position periodically equally during the day if desired; she needed to avoid hazards; she needed to avoid concentrated exposure to extreme temperatures, humidity, and vibrations; she needed to avoid even moderate exposure to pulmonary irritants; and she needed to be able to have the flexibility to take allotted work breaks when desired.
6. Through the date last insured, the claimant was capable of performing past relevant work as a receptionist and purchasing clerk. This work did not require the performance of work-related activities precluded by the claimant's residual functional capacity (20 CFR 404.1565).
7. The claimant was not under a disability, as defined in the Social Security Act, at any time from January 12, 2013, the alleged onset date, through September 30, 2015, the date last insured (20 CFR 404.1520(f)).

# **STANDARD OF REVIEW**

The Court begins its review of the ALJ's determination with the applicable legal standard. To be eligible for Supplemental Security Income and/or Disability Insurance Benefits, a claimant must show his or her inability to work is medical in nature and that he or she is totally disabled.

In order to establish a disability under the Social Security Act, a claimant must demonstrate an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(A). Establishing a disability under the Act is a five-step, sequential process. The inquiry ends if, at any given step, the Commissioner[2] affirmatively finds that the claimant is disabled or not disabled. Should the ALJ not make that determination, he or she must proceed to the next step. *See* 20 C.F.R. § 416.920(a)(4). In the following order, the ALJ must evaluate whether the claimant:

1) currently performs or, during the relevant time period, did perform any substantial gainful activity;

2) suffers from an impairment which is severe and "meets the duration requirement in § 416.909" or whether a combination of impairments is severe "and meets the duration requirement";

3) suffers from an impairment which meets or equals any impairment listed in appendix[3] 1 to subpart P of part 404 and which meets the duration requirement;

4) is unable to perform past relevant work; and

5) is able to make an adjustment to other work based on the claimant's Residual Functional Capacity ("RFC"), age, education, and work experience.

20 C.F.R. § 416.920(a)(4)(i)-(v).

---

[2] Generally, by way of an ALJ.
[3] Should the claimant not qualify under one of Step Three's listed impairments, the ALJ then proceeds to Step Four to determine the claimant's Residual Functional Capacity ("RFC"). Pursuant to the claimant's RFC, the ALJ determines under Steps Four and Five whether the claimant is capable of performing past work or other work available in the national economy. 20 C.F.R. § 404.1520(e)-(g).

This Court's review is governed by 42 U.S.C. § 405(g), which provides that "the findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." "Substantial evidence is 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Schaaf v. Astrue*, 602 F.3d 869, 874 (7th Cir. 2010) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)). Although less than a preponderance, substantial evidence is more than a "mere scintilla" of evidence; it is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson*, 402 U.S. at 401; *see also Diaz v. Chater*, 55 F.3d 300, 305 (7th Cir. 1995); *Powers v. Apfel*, 207 F.3d 431, 434 (7th Cir. 2000).

A Court will "review the ALJ's decision deferentially." *Overman v. Astrue*, F.3d 456, 462 (7th Cir. 2008). "'Although this standard is generous, it is not entirely uncritical.' And the case must be remanded if the decision lacks evidentiary support." *Id*. (quoting *Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002)). The Commissioner, acting through the ALJ, "is not required to address every piece of evidence or testimony presented, but must provide a 'logical bridge' between the evidence and his [or her] conclusions." *Terry v. Astrue*, 580 F.3d 471, 475 (7th Cir. 2009) (quoting *Clifford v. Apfel*, 227 F.3d 863, 872(7th Cir. 2000)). It is this Court's role to view the record as a whole, but it may not reweigh the evidence or substitute its judgment for that of the ALJ. *Schmidt v. Apfel*, 201 F.3d 970, 972 (7th Cir. 2000). The ALJ must articulate some minimal basis for the conclusions that he or she reaches so the reviewing court may "trace the path" of the ALJ's reasoning. *Willis v. Apfel*, 116 F. Supp. 2d 971, 974 (N.D. Ill. 2000) (quoting *Diaz*, 55 F.3d at 307); *see also Carlson v. Shalala*, 999 F.2d 180, 181 (7th Cir. 1993). If substantial evidence supports the ALJ's decision, it shall be affirmed even if "reasonable minds could differ concerning whether [the claimant] is disabled." *Elder v. Astrue*, 529 F.3d 408, 413 (7th Cir. 2008) (quoting *Schmidt v. Astrue*, 496 F.3d 833, 842 (7th Cir. 2007)).

**DISCUSSION**

Plaintiff alleges the ALJ did not reasonably evaluate Plaintiff's symptoms because he did not consider the combined effects of claimant's impairments. The regulations require the ALJ to apply a two-step process in evaluating a claimant's statement about her impairments. *See* 20 C.F.R. §§ 404.1528, 404.1529. The ALJ must first decide whether the claimant has a medically determinable impairment that "could reasonably be expected to produce the pain or other symptoms alleged." 20 C.F.R. § 404.1529(a). If the ALJ finds a medically determinable impairment, then the ALJ must "evaluate[s] the intensity and persistence" of the claimant's symptoms and determine how they limit her "capacity for work." 20 C.F.R. § 404.1529(c).

The ALJ first considered Plaintiff's mental impairments. The ALJ found that the "claimant's medically determinable mental impairments of depression and anxiety disorder, considered singly and in combination, did not cause more than minimal limitation in the claimant's ability to perform basic mental work activities and were therefore non-severe." (R. at 21). The ALJ considered the four statutory functional areas to be considered when evaluating mental disorders. (R. at 21-23). As mentioned above, this Court will uphold findings of the ALJ if they are supported by substantial evidence.

Plaintiff argues the ALJ did not adequately consider the Plaintiff's daytime fatigue. (ECF No. 10 at 13). Plaintiff claims that she sleeps during the day because of depression and that she has trouble sleeping at night. (R. at 221). The ALJ discussed how Plaintiff's doctors have repeatedly noted Plaintiff's non-compliance with her CPAP machine, told her that she needs to stop taking naps during the day and changed her medication to make her less drowsy. (R. at 781 941, 945, 949, and 1551). The medical evidence indicates that Plaintiff's fatigue was treatable and controllable if she followed the doctor's order. For example, on November 9, 2012, Plaintiff saw

9

Dr. Vales complaining of no appetite, fatigue and dizziness. (R. at 295). The doctor noted that he told her that he thought

> her fatigue mostly is her body adjusting to going through the stress of the last three to four weeks, her blood pressure coming under control, getting over the acute congestive failure, and that as things are stable for a longer period she will regain her strength.

(R. at 297). The Seventh Circuit held a condition that is treatable and controllable is not entitled to benefits. *Prochaska v. Barnhart*, 454 F.3d 731, 737 (7th Cir. 2006). Furthermore, the Plaintiff did not present evidence to show how her fatigue would limit her work under the sedentary conditions listed by the ALJ.

Additionally, the Plaintiff argues the ALJ erred in not considering Plaintiff's alleged issues with concentration and comprehension. (ECF No. 10 at 9 and 13). Plaintiff claims she used to read all the time but has only read three books since her surgery because of "lack of concentration." (R. at 204). She describes that she has issues following verbal instructions because she gets "confused and forgetful" but can follow written directions. (R. at 225.) The ALJ found "with respect to concentration, she was able to watch television, use a computer for social media 'a lot', and handle her finances without difficulty." (R. at 22).

The ALJ did not err as there were minimal mentions in the numerous pages of medical records that the Plaintiff had issues with comprehension or concentration. To the contrary, Dr. Sebastian noted that Plaintiff's "thought processes were logical, coherent and relevant." (R. at 823). In addition, he found the results of his testing showed that the Plaintiff was able to comprehend verbal and written directions, and able to "recall four of the five items that were previously learned after a five minute intervals." (R. at 826). An assessment completed on November 7, 2015, found that the Plaintiff could verbally understand others and was verbally understood by others and that her memory was intact. (R. at 1167.) The only notation in the

medical records to the contrary is Plaintiff's statement that she stopped taking her medication because she was confused given the numerous changes but the doctor did not further address the confusion other than to say that he discussed Plaintiff's medications with her. (R. at 535). Additionally, Plaintiff herself said she is able to complete all tasks regarding her finances and that her illness has not changed her ability to handle money. (R. at 203 and 223). In 2015, she listed computer games, jigsaw puzzles, crossword puzzles, Sudoku, trivia and movies as her hobbies. (R. at 1163.)

The ALJ noted that the only evidence that Plaintiff's mental impairments were affecting her ability to function was in March of 2016, when "the provider indicated that her depression might now be a factor in managing her overall health." (R. at 22). The Court takes issue with this characterization of the evidence since there are other notations in the record that the Plaintiff's depression was effecting her health. For example, during Plaintiff's cardiology consultation in October of 2012, the doctor say Plaintiff's "anxiety and depression [are] significantly overlaying [the] situation." (R. at 541). There is also evidence from January 2014, when Dr. Vales noted that he believed Plaintiff's anxiety and depression "plays a big part in her physical symptoms" and that "a lot her symptoms were believed to be psychosocial." (R. at 696). However, after reviewing the previous mentioned medical records there is still no evidence that the effects of her depression would prevent her from working.

Plaintiff also argues the ALJ did not properly consider how Plaintiff's speech issues would affect her ability to work. (ECF No. 10 at 9). The medical evidence does not support Plaintiff's subjective claims of continuous slurred speech. There was a brief time in 2014, where the Plaintiff complained of slurred speech but the doctor assured her it was medication related. (R. at 719). When Plaintiff was admitted to the hospital in July of 2014, the doctor noted that once her tongue

swelling went down after receiving treatment for angioedema, her "speech [was] pretty clear." (R. at 781). In September of 2014, Dr. Sebastian found Plaintiff's speech to be normal. (R. at 823).

Plaintiff also argues that the ALJ should have given more weight to the Plaintiff's treating physician, Dr. Vales, over the opinions of the medical consultants. (ECF No. 10 at 5-16). The Defendant points out that this letter dated, April 20, 2016, is from after Plaintiff's insurance lapsed on September 30, 2015. (R. at 255) (ECF No. 13 at 8). The letter stated that Plaintiff "is completely and unequivocally disabled from all forms of gainful employment." (R. at 255). The letter went on to say that Plaintiff could not sit or stand more than thirty minutes each. (R. at 255). The ALJ considered Plaintiff's limitations in his restrictive RFC for sedentary work. (R. at 27). The ALJ was correct to not give much weight to this letter as it was a conclusory opinion. The question of whether the Plaintiff is disabled is an issue reserved for the Commissioner. See 20 C.F.R. § 404.1527(e); *Gildon v. Astrue,* 260 F. App'x 927, 929 (7th Cir. 2008).

Plaintiff also argues she would be prevented from working because she would have to elevate her legs due to her edema. (ECF No. 10 at 16-17). The ALJ found that "there is insufficient evidence in the record that [elevating her legs] would have been medically required throughout the time at issue or that the flex break time included in the workday would not have been enough time to elevate her legs had she felt the need to do so." (R. at 27-28). The ALJ noted that Plaintiff was told she should be watching her salt, taking her medicine, using compression stockings, walking, and stopping smoking in addition to mentions that she should elevate her legs. While mild swelling or edema had been present in Plaintiff's legs, Plaintiff's doctors have indicated that they are not "overly concerned" by it. (R. at 1877). Dr. Vales recommended that Plaintiff "elevate her legs, watch her salt content" but that her mild edema "is acceptable." (R. at 280). When Plaintiff's was discharged from the hospital, the doctor noted that he talked to the Plaintiff about her "lower extremity swelling" and gave her a prescription for compression stockings. (R. at 1541). On

November 9, 2015, the doctor noted that he had advised the Plaintiff that she needs to quit smoking, be more stringent on her sodium intake, and lose weight. (R. at 1270). He also stated that "she is to elevate her legs as much as possible," but did not indicate for how long a day. (R. at 1270). During a doctor's visit in February of 2016, the doctor noted that she "has had a little more edema of late, but she has not being using her Zaroxlyn." (R. at 1873). All of the records provide substantial evidence to the ALJ's finding that Plaintiff would not be required to elevate her legs throughout the entire work day.

The Defendant argues the Plaintiff did not carry her burden of proving that she could not perform past relevant work. *Arbogast v. Bowen*, 860 F.2d 1400, 1403 (7th Cir. 1988)(the claimant bears the burden of establishing that she is unable to return to her past relevant work.) Plaintiff repeatedly referred to her previously employer as "indulgent" and argues that she would not be able to find another employer that was "so permissive." (ECF No. 10 at 17). However, there is no evidence in the record of these accommodations beyond Plaintiff's statement that her boss was "very understanding if I had to leave, or got to the emergency room, or be in the hospital." (R. at 40). Moreover, 'past relevant work' is defined in the regulations as "work you have done within the past 15 years" and Plaintiff has not made any mention of accommodations made in her previous positions. § 404.1560(c). The Court finds that the Plaintiff did not prove that she could not perform past relevant work.

IT IS THEREFORE ORDERED THAT:

(1) The Plaintiff's Motion for Summary Judgment (# 9) is DENIED.

(2) The defendant's Motion for Summary Judgment (# 12) is GRANTED.

(3) This case is terminated.

ENTERED this 20th day of August 2018.

                                                  /s/ Michael M. Mihm

                                                  Michael M. Mihm

                                                  U.S. District Court Judge